KENDALL–JACKSON WINERY, LTD., Plaintiff,

v.

Leonard L. BRANSON, et al., Defendants.

Jim Beam Brands Co, a Delaware corporation, d/b/a Peak Wines International, Plaintiff,

v.

Leonard L. Branson, et al., Defendants.

Sutter Home Winery, Inc., Plaintiff,

v.

Leonard L. Branson, et al., Defendants.

Nos. 99 C 3813, 99 C 4312, 99 C 4998.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 3, 2000.

Kevin A. Russell, David S. Foster, Patrick E. Gibbs, Latham & Watkins, Chicago, IL, for Kendall-Jackson Winery, Ltd.

Thomas A. Toppolo, Mary Therese Nagel, Illinois Atty. General's Office, Chicago, IL, for Leonard L. Branson, Don W. Adams, J.M. Hogan, Irving J. Koppel, Myrna E. Pederson.

Michael M. Conway, Michael Andrew Ficaro, John L. Rogers, Jeremiah Marsh, Hopkins & Sutter, P.C., Chicago, IL, David S. Americus Eugene E. Gozdecki, Gozdecki and DelGiudice, Chicago, IL, for Wirtz Corp.

### MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

The plaintiffs in these three related actions are suppliers of wine. They claim that the recently passed Illinois Wine and Spirits Industry Fair Dealing Act, 1999 Public Act 91–2 [hereinafter "the Fair Dealing Act" or "the Act"], is unconstitutional as violative of the Contracts and dormant Commerce Clauses of the United States Constitution. The defendants are the members of the Illinois Liquor Control Commission and three wholesale distributors of alcoholic beverages. Prior to the filing of this action, each of the distributors had filed a petition before the Commission against one of the suppliers, charging that the supplier had violated the Fair Dealing Act. The plaintiffs in this action have moved to enjoin the proceedings before the Commission and have requested a declaration that the Fair Dealing Act is unconstitutional. The defendants have moved to dismiss this action, arguing that because of the pending proceedings before the Commission, this court should abstain from hearing the plaintiffs' constitutional

challenge to the Fair Dealing Act. For the reasons set forth below, the defendants' motions to dismiss are denied and the plaintiffs' motions for a preliminary injunction are granted.

## BACKGROUND

### A. *No. 99 C 3813*

Plaintiff Kendall–Jackson is a winery based in Santa Rosa, California. In approximately December 1995, Kendall–Jackson selected Judge & Dolph to be the distributor of Kendall–Jackson's wines in northern Illinois. Judge & Dolph is an Illinois liquor distributorship owned by the defendant Wirtz Corporation. There is no written distributorship agreement between Kendall–Jackson and Judge & Dolph. Since early 1996, Judge & Dolph has acted as Kendall–Jackson's distributor in northern Illinois.

On April 22, 1999, Kendall–Jackson sent a letter to Judge & Dolph, stating that Kendall–Jackson would be terminating its distribution agreement with Judge & Dolph in 30 days. Kendall–Jackson claimed that it was terminating the agreement because of unsatisfactory performance by Judge & Dolph.

On May 21, 1999, the Illinois Wine and Spirits Industry Fair Dealing Act of 1999 was signed into law and immediately became effective. Pursuant to Section 35 of the Act, Judge & Dolph filed a petition for relief with the Illinois Liquor Control Commission. Judge & Dolph requested that the Commission find that Kendall–Jackson had violated Section 35(b) of the Act, which provides that a supplier may not terminate a distribution agreement "except by acting in good faith in all aspects of the relationship, without discrimination or coercion, and not in retaliation or as a result of the distributor's exercise of its right to petition the General Assembly" for passage of a bill. Judge & Dolph alleged in its petition that its performance was not deficient and that the real reason for the termination was Judge & Dolph's lobbying on behalf of the Act. Judge & Dolph also requested the Commission enter an order requiring Kendall–Jackson to continue providing products to Judge & Dolph until the dispute is resolved by a final order. Finally, Judge & Dolph requested that the Commission prohibit Kendall–Jackson from providing products to anyone else for distribution in the area served by Judge & Dolph until the dispute is resolved by a final order.

On June 2, 1999, the Commission found that the petition by Judge & Dolph "establishes a prima facie case that there was an improper termination of the distributorship relationship" under Section 35(b). The Commission issued an order requiring Kendall–Jackson to "continue providing the product or products alleged to have been withdrawn in violation of the Fair Dealing Act to the Petitioner at prices and quantities in effect under the prior distributorship relationship ... during the pendency of this matter and until such time as the Commission has entered its final order...." The Commission did not bar Kendall–Jackson from providing products to other distributors in the area served by Judge & Dolph. Judge & Dolph's petition to the Commission was not verified or certified nor was it accompanied by any affidavits. The Commission did not provide Kendall–Jackson with notice that it was considering Judge & Dolph's petition and did not conduct a hearing.

On June 9, 1999, Kendall–Jackson filed this action, requesting that this court enjoin enforcement of the Fair Dealing Act against Kendall–Jackson and declare the Act unconstitutional. Kendall–Jackson claims that the Act violates the Contracts Clause of the U.S. Constitution by substantially impairing Kendall–Jackson's contractual rights. Kendall–Jackson also claims that the Act violates the dormant Commerce Clause of the U.S. Constitution by discriminating against out-of-state wineries. Finally, Kendall–Jackson seeks a declaration that its termination of its distribution agreement with Judge & Dolph is effective and lawful.

## B. *No. 99 C 4312*

Plaintiff Jim Beam Brands Co. is the parent corporation for Peak Wines International. Peak is a winery and a California corporation with its principal place of business in Geyersville, California. Defendant Pacific Wine Company is a distributor in Illinois. In 1993, Peak and Pacific entered into an agreement under which Pacific became the exclusive distributor of Peak's wines in Illinois. Jim Beam acquired Peak in June 1998.

The bill that later became the Fair Dealing Act was passed by the Illinois Senate on May 14, 1999. On May 17, 1999, Peak informed Pacific orally and in writing that Peak was terminating Pacific's exclusive distributorship rights with respect to all Peak brands. As noted above, the Fair Dealing Act was signed into law on May 21, 1999, four days after Jim Beam/Peak informed Pacific that it was terminating the distribution agreement.

On May 28, 1999, Pacific filed a petition with the Illinois Liquor Control Commission, alleging that Peak and Jim Beam violated Section 35 of the Fair Dealing Act when the distribution agreement was terminated. The petition was not verified or certified. On June 2, 1999, in response to Pacific's request, the Commission issued an order requiring Jim Beam/Peak to continue providing products to Pacific until the Commission issues a final order resolving the dispute. Jim Beam/Peak was not given notice or the opportunity to respond before the Commission issued its order. Although Pacific also requested that the Commission issue an order prohibiting Jim Beam/Peak from distributing products to other distributors in Pacific's distribution area, the Commission did not issue such an order.

Like plaintiff Kendall–Jackson, Jim Beam/Peak has filed an action claiming that the Fair Dealing Act is unconstitutional. The action filed by Jim Beam/Peak was reassigned to this court pursuant to Local General Rule 2.31.

## C. *No. 99 C 4998*

Plaintiff Sutter Home Winery is based in St. Helena, California. Defendant RJ Distributing Co. is a Peoria-based wholesale distributor of wines and spirits. On October 6, 1993, Sutter Home and RJ entered into a written distribution agreement. The agreement was valid through June 30, 1994, and was renewed thereafter for a period of six months or one year in each year from 1994 to 1998. The agreement permitted Sutter Home to terminate the agreement if, among other things, there was a change of ownership or management of RJ or if RJ attempted to assign its rights or obligations under the agreement. RJ agreed to provide at least 15 days prior notice of any contemplated change of ownership or management or of any attempted assignment.

In a May 7, 1999 letter to its "Dear Valued Customers," RJ announced that "RJ Distributing Company's wine division has joined with Pacific Wine & Spirits from Chicago to create a new company called R.J. Pacific." The May 7 letter, which was sent on the letterhead of R.J. Pacific L.L.C. and signed by Robert Jockisch, the president and chief executive officer of RJ, attached a listing of wines available to retailers from the newly formed company, including each of the Sutter Home products RJ was to distribute under RJ's distributorship agreement with Sutter Home.

On or about May 14, 1999, Sutter Home learned of RJ's May 7, 1999 letter. In a May 18, 1999 letter, Sutter Home informed RJ that

We were told that you changed the ownership or management of your company, or assigned your rights or obligations under your Sutter Home and Montevina agreements with us. Such actions rendered our agreements void.

In any event, as you know, our agreements expire by their own terms on June 30, 1999. We will not be renewing the agreements upon that expiration.

On May 28, 1999, RJ filed a petition with the Illinois Liquor Control Commission, requesting a finding that Sutter Home violated Section 35 of the Fair Dealing Act by failing to renew the distribution agreement. The petition included an affidavit from Jockisch averring that the information in the petition was correct. RJ also requested that the Commission issue an order requiring Sutter Home to continue providing products to RJ during the pendency of the dispute. Finally, RJ asked the Commission to issue an order prohibiting Sutter Home from providing products to any other distributor in RJ's sales territory.

On June 2, 1999, the Commission issued an order directing Sutter Home to continue providing products to RJ until the Commission issues a final order resolving the dispute. The Commission did not provide Sutter Home with notice or an opportunity to be heard before issuing the June 2, 1999 order. The Commission did not prohibit Sutter Home from providing products to other distributors in RJ's sales territory.

Like plaintiffs Kendall–Jackson and Jim Beam, Sutter Home filed an action in federal court claiming that the Fair Dealing Act is unconstitutional.

## D. *The Illinois Wine and Spirits Industry Fair Dealing Act*

The Act was signed into law on May 21, 1999. Its declared purpose is "to promote the public's interest in fair, efficient, and competitive distribution of wine and liquor products." Sec. 10(a)(ii). The Act regulates agreements between distributors and suppliers of liquor. The Act does not apply to agreements between a distributor and a supplier when the supplier is "an Illinois winery" or is a "winery that has annual case sales in the State of Illinois less than or equal to 10,000 cases per year."

The Illinois Liquor Control Commission has the general authority to administer laws regulating liquor. For example, the Commission has responsibility for issuing licenses to manufacturers and retailers of alcohol and has the authority to revoke or suspend such licenses. *See* 235 ILCS 5/3–12. Illinois has adopted the "three-tier" system of liquor distribution, in which there are (1) suppliers or manufacturers, (2) wholesale distributors and (3) retailers. *See* 235 ILCS 5/1–1 *et seq*. Manufacturers/suppliers are required to register with the Commission the names of the distributors who have been authorized to sell the manufacturer's products at wholesale. 235 ILCS 5/6–9.

Sections 15 through 30 of the Act apply only to agreements between suppliers and distributors entered into or renewed after the effective date of the Act. Section 15 provides that a supplier may not "cancel, fail to renew, otherwise terminate, or alter on a discriminatory basis an agreement" without good cause. Section 20 requires a supplier to provide written notice of the supplier's intent to cancel, not renew, otherwise terminate, or alter a distribution agreement. The notice must be sent 90 days before the supplier cancels, fails to renew, otherwise terminates or alters the agreement. The notice must include a statement of reasons "including all data and documentation necessary to fully apprise the distributor of the reasons for the action" and must give the distributor "60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days, the notice shall be void."

In certain circumstances, the supplier is not required to provide notice 90 days in advance of taking action. A supplier does not have to supply any advance notice if the action is taken because of (1) the distributor's assignment for the benefit of creditors, or similar disposition, of substantially all of the assets of the distributor's business; (2) the insolvency of the distributor or the institution of bankruptcy proceedings by or against the distributor; (3) the dissolution or liquidation of the distributor; or (4) the distributor's conviction of, or plea of guilty or no contest to, a charge of violating a law or regulation in this State that materially and adversely

affects the ability of either party to continue to sell wine or liquor in the State, or the revocation or suspension of a license or permit to sell wine or liquor in this State. Section 15(c). A supplier need provide only 10 days advance notice if the cancellation, nonrenewal, termination or alteration is based upon (1) the failure of the distributor to pay any account when due; or (2) bad faith in the performance of the distributorship agreement. Section 15(d). Section 25 authorizes parties to a distributorship agreement to bring actions for damages and injunctive relief based upon violations of the Act.

Section 35 "applies to all agreements between a distributor and a supplier (other than agreements with an Illinois winery or a winery that has annual case sales in the State of Illinois less than or equal to 10,000 cases per year) whether those agreements were entered into before or after the effective date of this Act." Section 35 of the Act purportedly "clarifies existing rights and obligations and establishes remedial procedures applicable to registrations under Section 6–9 of the Liquor Control Act of 1934."

Section 35(b) provides that "[u]nder existing Illinois common and statutory law, suppliers, other than (i) Illinois wineries or (ii) wineries that have annual case sales in the State of Illinois less than or equal to 10,000 cases per year, ... have an obligation to act in good faith in all aspects of the registration and distributorship relationship.... Under the existing obligation to act in good faith, no registration or obligation to register under Section 6–9 may be terminated nor may a supplier ... fail to renew or extend a product, name, brand, registration, or an agreement with a distributor except by acting in good faith in all aspects of the relationship, without discrimination or coercion, and not in retaliation or as a result of the distributor's exercise of its right to petition the General Assembly, the Congress, or any other unit or form of government for any purpose, to any end, or for or against any proposition, provision, amendment, bill, resolution, judgment, decision, rule, regulation, or interpretation."

Section 35(c)(1) gives the Illinois Liquor Commission the power to prohibit or suspend any supplier from selling its products in Illinois if the supplier is found to have "flagrantly or repeatedly violated" Section 35. Section 35(c)(2) grants the Commission the authority to order the supplier "to continue providing products to a distributor at prices and quantities in effect for the distributorship prior to any termination or failure to renew that becomes the subject of a dispute or administrative proceedings under this Section until the matters in dispute are determined by an order which is final and non-reviewable." Section 35(c) specifies that orders entered under Section 35 are "deemed orders as to which an emergency exists."

Under Section 35(d), any aggrieved party may apply to the Commission for a finding that another party has violated this section and request relief. The Act does not specify what process the Commission must employ to reach such a finding. The Act also does not specify what evidence a petitioner must provide in order to obtain preliminary or permanent relief.[1]

Section 35(e) specifies that orders entered by the Commission under this section are reviewable by the Circuit Court under the terms of the Administrative Review Law. On review, the findings and conclusions of the Commission are prima facie true and correct. However, non-final orders, such as those here requiring the suppliers to continue providing products to the distributors pending a final order by the Commission, are not reviewable. Section 35(f) provides that "[n]o court shall enter a stay, restraining order, injunction, mandamus, or other order that has the effect of suspending, delaying, modifying,

---

1. As noted above, the Commission's orders here were entered on the basis of petitions, which were unverified in two of the three cases, without notice to the suppliers or a hearing.

or overturning a Commission finding or determination under this Section before a full hearing and final decision on the merits of the Commission ruling, finding, or order."

The Act contains a severability clause, which provides that "[i]f any provision or interpretation of this Act, or the application of such interpretation or provision to any distributorship, is held invalid, the application of the Act to persons or circumstances other than those as to which it is held invalid shall not be affected thereby." Section 10(e).

The Illinois Liquor Control Commission has issued emergency rules, pursuant to ILCS 100/5–45, governing disputes under the Fair Dealing Act. The rules went into effect on July 13, 1999, after the petitions in each of the instant cases was filed with the Commission.

Among other things, the emergency rules require a petition for relief to include a "detailed statement of the facts and circumstances giving rise to the allegations of violation of the Fair Dealing Act." 11 Ill. Admin. Code 100.400(a)(6), *reprinted at* Illinois Register, 23 Ill. Reg. 8687. The emergency rules require that a petition be certified. 11 Ill. Admin. Code 100.400(g)(15). The emergency rules permit the respondent to file a motion "directed to the adequacy or sufficiency of the application" within 14 days after the respondent is served with the petition. 11 Ill. Admin. Code 400(d). The rules also allow for motions or petitions to "vacate, alter or otherwise modify orders entered by the Commission." *Id.*

Under the emergency rules, when a petitioner requests preliminary relief, such as an order requiring the respondent to continue providing products pending a final decision on the merits, the respondent must receive notice that the petitioner is requesting such relief. 11 Ill. Admin. Code 100.400(e). The respondent has 7 days to file a response to the request for preliminary relief. *Id.* "The party moving the Commission for the entry of a preliminary order shall have the burden of establishing the entitlement to relief, unless the Fair Dealing Act provides to the contrary." *Id.* The rules permit a preliminary order establishing the status quo (*i.e.*, requiring a supplier to continue providing products to a distributor) without notice to the supplier/respondent only if "it clearly appears from the facts shown by verified application or by affidavit if by supplemental request (motion, petition) that immediate and irreparable harm, damage or loss will result to the movant before notice can be served and a hearing on the application can be had." *Id.* The emergency rules also provide for discovery. *See* Ill. Admin. Code 100.400(f).

## DISCUSSION

The plaintiffs argue that the Fair Dealing Act is unconstitutional. They argue that Section 35 violates the Contracts Clause of the United States Constitution, art. I, sec. 10. As noted above, Section 35(b) purports to clarify existing law. However, plaintiffs claim that by requiring suppliers who were in agreements before the effective date of the Act to act in good faith in terminating or declining to renew such agreements, by requiring them to act without "discrimination or coercion" and by prohibiting them from acting in retaliation for a distributor's petitioning the government, Section 35 substantially impairs their contractual rights in violation of the Contracts Clause. They also claim that Section 35 impairs their contractual rights by authorizing the Commission to issue nonreviewable orders requiring them to continue providing products to the distributors until the dispute is resolved by a final order of the Commission. In addition, they argue that the Fair Dealing Act discriminates against out-of-state suppliers, in violation of the dormant Commerce Clause, U.S. Const. art. I, sec. 8, cl. 3, by specifically excepting Illinois wineries from the provisions of the Act.

## I. *The Motions to Dismiss under Federal Abstention Doctrines*

■ The defendants argue that this court should not exercise jurisdiction over

these actions because of federal abstention doctrines. In particular, defendants argue that *Younger* abstention, *Pullman* abstention, and/or *Burford* abstention require this court to decline jurisdiction. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is the appropriate mechanism for raising abstention issues. *Lowery v. Schnorf,* No. 97 C 6688, 1998 WL 341835, at *2 (N.D. Ill. June 18, 1998).

The Supreme Court has stated that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "Abstention rarely should be invoked, because the federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Ankenbrandt v. Richards,* 504 U.S. 689, 705, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992) (quoting *Colorado River,* 424 U.S. at 817, 96 S.Ct. 1236). The court addresses each of the abstention doctrines below.

### A. *Younger Abstention*

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that a federal court should not enjoin a pending state criminal proceeding unless an injunction is necessary to prevent great and immediate irreparable injury. The Court held that federal courts should refrain from interfering with state criminal prosecutions because of "the notion of 'comity,' that is, a proper respect for state functions." *Id.* at 44, 91 S.Ct. 746. The Court has noted that in circumstances when abstention would otherwise be required, there are narrow exceptions to the *Younger* rule, such as when the prosecution is the result of bad faith and harassment or when a statute is "flagrantly and patently violative of express constitutional prohibitions." *Id.* at 53–54, 91 S.Ct. 746.

Although *Younger* involved a pending state criminal prosecution, the *Younger* abstention doctrine has been expanded to apply to other pending state proceedings. In *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the state of Ohio successfully brought a civil action in state court to close a theater for one year. The state relied on a nuisance statute providing that a place exhibiting obscene films is a nuisance and may be closed for one year. The theater owner brought an action in federal court, seeking to have the state court judgment enjoined. The Supreme Court found that the same federalism concerns raised in *Younger* required abstention in *Huffman,* noting that the civil proceeding under the nuisance statute is "more akin to a criminal prosecution than are most civil cases .... and is in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials." *Huffman,* 420 U.S. at 604, 95 S.Ct. 1200.

Although *Huffman* suggested that *Younger* abstention in civil proceedings might be limited to civil proceedings that are similar or closely related to criminal proceedings, the Supreme Court rejected such a limitation in *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). In *Juidice,* a creditor obtained a default judgment in state court against Vail. Vail failed to satisfy the judgment, and when Vail failed to respond to a subpoena and appear at a deposition, a state court judge issued an order to show cause why Vail should not be punished for contempt. Vail brought an action in federal court seeking to enjoin New York's statutory contempt procedures. In finding that the lower federal court should have abstained, the Supreme Court held that "[w]hether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature, we think the salient fact is that federal court interference with the State's contempt process is 'an offense to the State's interest ... likely to be every bit as great as it would be were this a criminal proceeding.'" *Id.* at 334, 97 S.Ct. 1211 (quoting *Huffman,* 420 U.S. at 604, 95 S.Ct. 1200).

In subsequent cases, the Supreme Court has found that *Younger* abstention should apply in other civil proceedings. In *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), the state of Illinois had brought a civil action to recover welfare payments that allegedly had been obtained through fraud. Simultaneously, the state obtained a writ attaching money in a credit union belonging to the welfare recipients. The recipients brought an action in federal court challenging the Illinois attachment procedures. The Supreme Court held that the lower federal court should have abstained. The Court noted that "the State was a party to the suit in its role of administering its public assistance programs" and concluded that "the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity." *Id.* at 444, 97 S.Ct. 1911.

In *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), the Supreme Court held that the federal courts should abstain from deciding whether provisions of the Texas Family Code were unconstitutional when there was a pending civil court proceeding brought by the State for temporary custody of allegedly abused children. The Court noted that the case was like *Huffman* in that "the State here was a party to the state proceedings, and the temporary removal of a child in a child-abuse context is, like the public nuisance statute involved in *Huffman*, 'in aid of and closely related to criminal statutes.'" *Moore*, 442 U.S. at 423, 99 S.Ct. 2371 (quoting *Huffman*, 420 U.S. at 604, 95 S.Ct. 1200)."

■ In two cases, the Supreme Court expanded the *Younger* doctrine to require federal courts to abstain in favor of certain types of state administrative proceedings. In *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), an attorney was charged with ethical violations and faced disciplinary proceedings before a local ethics committee. The attorney brought a federal action challenging the constitutionality of the disciplinary rules. The Court established a three-part test to determine if *Younger* abstention was appropriate: first, is the state proceeding judicial in nature; second, do the state proceedings implicate important state interests; third, is there an adequate opportunity in the state proceedings to raise constitutional challenges. *Id.* at 432, 102 S.Ct. 2515. The Court answered all three questions in the affirmative and concluded that *Younger* abstention was required. The Court noted that "the State's interest in the present litigation is demonstrated by the fact that the Middlesex County Ethics Committee, an agency of the Supreme Court of New Jersey, is the named defendant in the present suit and was the body which initiated the state proceedings against respondent Hinds." *Id.* at 434–35, 102 S.Ct. 2515.

In the second case requiring abstention due to a pending state administrative proceeding, *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), a teacher retained an attorney and threatened litigation when she was not rehired because of her pregnancy. She was then terminated because she went outside the "Biblical chain of command" in attempting to resolve the dispute. The teacher filed a complaint with the Ohio Civil Rights Commission, alleging that she was subjected to sex discrimination when she was not rehired and that she was unlawfully penalized for asserting her rights when she was terminated. The Commission notified Dayton that it was investigating the matter and later initiated administrative proceedings against Dayton by filing a complaint. Dayton brought a federal action to enjoin the Commission's proceedings, arguing that the Commission's investigation or imposition of sanctions would violate the Religion Clauses of the First Amendment. Applying the three-prong test from *Middlesex*, the Court held that *Younger* abstention was required. In determining

that Dayton had an adequate opportunity to raise constitutional challenges, the Court noted that even if Dayton could not raise constitutional claims in the administrative proceedings, "it is sufficient ... that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Id.* at 629, 106 S.Ct. 2718.

In *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), Pennzoil and Getty Oil Co. had negotiated an agreement in which Pennzoil was to buy a substantial number of Getty's shares. Texaco eventually purchased the shares at a higher price. Pennzoil brought an action in Texas state court, claiming that Texaco had tortiously induced Getty to breach the agreement to sell its shares to Pennzoil. A jury reached a verdict in favor of Pennzoil and found actual damages of $7.53 billion and punitive damages of $3 billion. Under Texas law, Pennzoil had the power to secure a lien on Texaco's property in Texas. Pennzoil also had the power to get the judgment enforced by state officials so that it could take possession of Texaco's assets. Texaco could suspend execution of the judgment by filing a bond equal to at least the amount of the judgment, interest, and costs.

Texaco did not challenge the judgment or the execution of the judgment on federal grounds in state court. Instead, Texaco filed an action in the United States District Court for the Southern District of New York, arguing that the judgment and the bond and lien provisions violated federal law and various provisions of the U.S. Constitution. Texaco sought an injunction to prevent Pennzoil from taking any action to enforce the judgment. The district court issued the injunction and the Second Circuit affirmed. The Supreme Court held that the federal courts should have abstained under the *Younger* doctrine. The Court found that Texas' interest in administering certain aspects of its judicial system was sufficiently important to require abstention. The Court noted that

> [b]oth *Juidice* and this case involve challenges to the processes by which the State compels compliance with the judgments of its courts. Not only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained. So long as those challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand.

*Pennzoil*, 481 U.S. at 13–14, 107 S.Ct. 1519. The Court rejected the notion that Texas' interest in the proceeding was only as an adjudicator of wholly private disputes, noting that "[o]ur opinion does not hold that *Younger* abstention is always appropriate whenever a civil proceeding is pending in a state court. Rather, as in *Juidice*, we rely on the State's interest in protecting 'the authority of the judicial system, so that its orders and judgments are not rendered nugatory.'" *Pennzoil*, 481 U.S. at 14 n. 12, 107 S.Ct. 1519 (quoting *Juidice*, 430 U.S. at 336 n. 12, 97 S.Ct. 1211).

The Court also noted that the same concern that may justify *Pullman* abstention – avoiding unwarranted determination of federal constitutional questions – may also weigh in favor of *Younger* abstention. The Court held that "it was entirely possible that the Texas courts would have resolved this case on state statutory or constitutional grounds, without reaching the federal constitutional questions Texaco raises in this case." *Pennzoil*, 481 U.S. at 12, 107 S.Ct. 1519.

The Seventh Circuit has applied the three-part *Middlesex* test on several occasions. *See, e.g., Crenshaw v. The Supreme Court of Indiana*, 170 F.3d 725, 727–28 (7th Cir.1999); *Majors v. Engelbrecht*, 149 F.3d 709, 711–14 (7th Cir.1998).

█ As to the first prong of the test, this court finds that the proceedings before the Illinois Liquor Control Commission are judicial in nature. The plaintiffs

argue that the proceedings are not judicial because they lack some of the procedural protections of court proceedings.[2] In particular, they complain that, with little or no evidentiary support, the Commission issued *ex parte* nonreviewable orders requiring them to continue providing products to the distributors during the pendency of the proceedings before the Commission. However, the absence of certain features of court process does not necessarily render a proceeding other than a judicial proceeding. In *New Orleans Public Service, Inc. (NOPSI) v. Council of City of New Orleans*, 491 U.S. 350, 370–71, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Supreme Court noted that a "judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Id.* (quoting *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908)). Under this standard, the proceedings before the Commission are judicial.

Under the second prong of the *Middlesex* test, the question is whether the state proceedings implicate important state interests. While the parties vigorously dispute whether the Fair Dealing Act is designed to protect and further the public interest or protect the economic interests of certain Illinois distributors, states have the primary responsibility for regulating liquor distribution. The state has an important interest in regulating liquor distribution, and the Act implicates this interest.

■ However, careful review of the cases applying *Younger* abstention convinces this court that abstention is not warranted here. In virtually any case in which a federal plaintiff is challenging the constitutionality of a state statute, there is a strong argument that an important state interest is implicated. After all, the state legislature and the governor have determined that the statute was important enough to be enacted. However, the Su-

preme Court has noted that *Younger* abstention is not "always appropriate whenever a civil proceeding is pending in a state court." *Pennzoil*, 481 U.S. at 14 n. 12, 107 S.Ct. 1519. There must be something more than a state's interest in the constitutionality of its own statutes for *Younger* to apply.

The key question the *Middlesex* test is designed to answer is whether the state proceeding "is the type of proceeding to which *Younger* applies." *NOPSI*, 491 U.S. at 367, 109 S.Ct. 2506. The Supreme Court noted that "our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 368, 109 S.Ct. 2506 (citations omitted).

The proceedings in the Commission are not criminal prosecutions. Nor are they enforcement actions brought by a state actor or state agency in civil court, as in *Huffman* or *Trainor*. The defendants argue that the proceedings before the Commission are administrative enforcement actions. As the defendants note, Section 35(c)(1) gives the Commission the power to prohibit or suspend a supplier from selling its products in Illinois if the supplier is found to have flagrantly or repeatedly violated Section 35. Although this is consistent with an enforcement action, here, private parties, *i.e.*, the distributors, are pursuing relief through the Commission, and the primary remedy sought by the distributors – an order under Section 35(d) that the suppliers violated the Fair Dealing Act – is similar to a remedy that a private party could obtain in a civil action. Thus, the present action is distinguishable from proceedings such as disciplinary actions against attorneys or nurses brought by a public agency, where *Younger* ab-

---

2. As noted above, the Commission has promulgated emergency rules to implement the Fair Dealing Act that provide for discovery and motion practice. *See* 11 Ill. Admin. Code 100.400.

stention has been required. *See Crenshaw*, 170 F.3d at 728; *Majors*, 149 F.3d at 712–13.

The defendants note that *Younger* abstention may be appropriate even if the administrative proceedings are initiated by a private party. In *Dayton Christian Schools*, the administrative process was initiated when a teacher filed a complaint with the Ohio Civil Rights Commission. However, in that case, upon receiving the complaint, the Ohio Civil Rights Commission took over responsibility for investigating and pursuing the complaint. The Illinois Liquor Control Commission is not prosecuting this action but is instead a forum for private parties to adjudicate their disputes regarding their distributorship agreements. Here, the preliminary orders issued by the Commission were at the request of private parties, the distributors, and the Commission did not investigate or convene a hearing. The orders reflect no factfinding or investigation by any state agency, which suggests that the state has no more interest in the resolution of this dispute than it does in any private civil action taking place in the context of a regulated industry. This court thus concludes that the proceedings before the Illinois Liquor Control Commission are not enforcement proceedings.[3]

In *Pennzoil*, the Supreme Court reaffirmed that *Younger* abstention is not "always appropriate whenever a civil proceeding is pending in a state court." 481 U.S. at 14 n. 12, 107 S.Ct. 1519. In several prior cases, the Supreme Court had cautioned that, although *Younger* abstention was appropriate in that instance, the Court was not holding that abstention was required whenever there was a state proceeding involving a federal plaintiff. *See Moore*, 442 U.S. at 423 n. 8, 99 S.Ct. 2371 ("[C]ontrary to the suggestion of the dissent, we do not remotely suggest 'that every pending proceeding between a State and a federal plaintiff justifies abstention unless one of the exceptions to *Younger* applies.'"); *Juidice*, 430 U.S. at 336 n. 13, 97 S.Ct. 1211; *Trainor*, 431 U.S. at 445 n. 8, 97 S.Ct. 1911.

Of course, in certain instances *Younger* abstention may be appropriate even though the state proceedings involve what is primarily a private dispute. This is the case when the "civil proceedings involv[e] certain orders that are uniquely in further-

3. In *Alleghany Corp. v. Haase*, 896 F.2d 1046, 1050 (7th Cir.1990), *vacated on other grounds*, *Dillon v. Alleghany Corp.*, 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991), the Seventh Circuit noted that *Younger's* "central meaning is that a federal district court may not, save in exceptional circumstances, enjoin, at the behest of a person who has actually or arguably violated a state statute, a state court proceeding to enforce the statute against that person." Defendants here note that plaintiffs are alleged to have violated a state statute, the Fair Dealing Act. However, as noted above, the proceedings before the Commission cannot fairly be characterized as part of an enforcement proceeding. Indeed, in *Alleghany*, the court noted that

Any intimations of a broader scope for *Younger* arising from the fact that the plaintiff in *Pennzoil* was not a public agency were promptly scotched by *New Orleans Public Service, Inc. (NOPSI) v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 2518–20, 105 L.Ed.2d 298 (1989). The essential thing in *Pennzoil*, it is now clear, is that once the state trial court rendered a judgment against Texaco, the state had a substantial interest in enforcing the procedures that it had established to regulate appeals. For Texaco to sue in federal court to enjoin collection was like a convicted state criminal defendant's suing in federal court to enjoin the state from requiring him to appeal within a fixed period of time.

*Alleghany*, 896 F.2d at 1052. Similarly, in *Illinois v. General Electric Co.*, 683 F.2d 206, 212 (7th Cir.1982), the Seventh Circuit indicated that some type of prosecution or enforcement action was necessary to bring *Younger* into play. The court noted that "federal courts ordinarily will not interfere in pending state prosecutions-provided only that the state brought some sort of enforcement proceeding before the federal suit was well advanced. For the term 'prosecution' has been broadened to include civil enforcement actions, clearly including the type of civil penalty suit that the state could have brought under the Spent Fuel Act if General Electric and Southern California Edison had gone ahead and violated the Act." *Id.*

ance of the state courts' ability to perform their judicial functions." *NOPSI*, 491 U.S. at 368, 109 S.Ct. 2506. Thus, in a dispute between private parties, *Younger* abstention was required when the federal plaintiff was challenging the state courts' civil contempt order, *Juidice*, 430 U.S. at 336, 97 S.Ct. 1211, or a state court's procedure for enforcing judgments, *Pennzoil*, 481 U.S. at 13, 107 S.Ct. 1519. Here, however, the plaintiffs' constitutional challenges do not implicate the state courts' ability to perform their judicial functions. They do not "involve challenges to the processes by which the State compels compliance with the judgments of its courts." *Id.* at 13–14, 107 S.Ct. 1519. Rather, the plaintiffs are merely challenging the constitutionality of a single statute regulating a narrow class of contractual relationships.

The third prong of the *Middlesex* test asks whether the federal plaintiffs will have an adequate opportunity to present their constitutional challenges in the state proceedings. Although the Liquor Control Commission lacks the power to declare a state statute unconstitutional, *see Texaco–Cities Serv. Pipeline Co. v. McGaw*, 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481, 489 (1998), the plaintiffs can raise their constitutional challenges on administrative review in the Illinois state courts once the Commission has issued a final order.[4] In *Dayton Christian Schools*, the Supreme Court held that "it is sufficient ... that constitutional claims may be raised in state-court judicial review of the administrative proceeding." 477 U.S. at 629, 106 S.Ct. 2718. The Supreme Court noted that it has "repeatedly rejected the argument that a constitutional attack on state procedures themselves 'automatically vitiates the adequacy of those procedures for purposes of the *Younger–Huffman* line of cases.'" *Id.* at 628, 106 S.Ct. 2718 (quot-

ing *Moore*, 442 U.S. at 427 n. 10, 99 S.Ct. 2371).

However, unlike the situation in *Dayton Christian Schools*, the Fair Dealing Act bars any judicial review of the Commission's preliminary orders, including the *ex parte* orders here requiring the suppliers to continue providing products to the distributors, until the Commission has issued final orders. Fair Dealing Act, Section 35(f). Thus, until the Commission issues final orders (and the Act does not set a time limitation for the Commission to issue a final order), the suppliers are subject to a mandatory injunction requiring them to continue doing business with the distributors, despite the suppliers' claims that they have no contractual obligation to maintain their relationships with the distributors.

The plaintiffs/suppliers have no opportunity to present their constitutional challenge to the orders until the administrative proceedings are complete. The plaintiffs argue that the provision of the Act authorizing the Commission to issue such orders violates the Contracts Clause. Prior to the Act, when suppliers terminated or declined to renew a distributorship agreement, they could of course be subject to an award of damages (or even specific performance) if they were found to have breached the agreement. But there was little possibility that they would face a mandatory injunction requiring them to continue doing business with the distributors. Even in rare circumstances where a court would consider such an injunction, the movant would be forced to demonstrate, among other things, irreparable harm in order to obtain such relief. In contrast to the plaintiffs here, the non-moving party would receive notice and an opportunity to be heard before a court would issue an injunction.[5] *See* Fed.R.Civ.P. 65(a); ILCS

---

4. Although an administrative agency lacks the power to declare a state statute unconstitutional, *Texaco–Cities Serv. Pipeline* held that a party that fails to raise a constitutional issue before an administrative agency waives its right to raise the issue on administrative review. 230 Ill.Dec. 991, 695 N.E.2d at 489.

5. Of course, in an emergency a party may obtain a temporary restraining order without providing notice to the opposing party. However, in contrast with the preliminary orders here, the TRO is for a very limited duration. *See* Fed.R.Civ.P. 65(b); ILCS 5/11–101.

5/11–102. Moreover, in state and federal court, a party subject to a preliminary injunction has an immediate right to appeal. *See* 28 U.S.C. § 1292(a)(1); Ill. Sup. Ct. R. 307(a)(1).

■ Thus, although the plaintiffs' constitutional attack on the Act's provision authorizing the Commission to issue preliminary orders does not "automatically" vitiate the adequacy of the state proceedings, here, the open-ended delay (*i.e.*, until the Commission issues a final order) before plaintiffs can bring their constitutional challenges, coupled with the onerous and unreviewable preliminary orders entered against plaintiffs lead this court to conclude that the state proceedings do not provide plaintiffs with an adequate opportunity to present their constitutional challenges.

"The decision whether to abstain 'does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Barichello v. McDonald,* 98 F.3d 948, 955 (7th Cir.1996) (quoting *Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Although the court agrees that the proceedings before the Illinois Liquor Control Commission are "judicial in nature," the second and third prongs of the *Middlesex* test lead this court to conclude that the *Younger* abstention doctrine does not require this court to decline jurisdiction over the federal actions.

### B. *Pullman Abstention*

The *Pullman* doctrine originated with the Supreme Court's decision in *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman,* the Texas Railroad Commission issued an order requiring that any train with a sleeping car must carry a Pullman conductor. It had been the practice to assign a Pullman conductor to trains with two or more sleeping cars and to assign a porter to trains with only one sleeping car.

Conductors were white and porters were black. The Pullman Company, the affected railroads and the Pullman porters brought an action in federal court to enjoin the order, claiming that it violated the Equal Protection, Due Process, and Commerce Clauses of the U.S. Constitution. They also claimed that the order was not authorized by Texas law. A lower federal court enjoined enforcement of the Commission's order, finding that the order was not authorized by the Texas statutes relied upon by the Commission. The Supreme Court concluded that the lower court should not have reached the merits; instead, the lower court should have retained the case on its docket until the state court determined if the Commission had authority to issue the order. The Court noted that "[i]n this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court." *Id.* at 500, 61 S.Ct. 643. "If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise." *Id.* at 501, 61 S.Ct. 643.

■ More recently, the Seventh Circuit noted that *Pullman* abstention applies only where "the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law." *International College of Surgeons (ICS) v. City of Chicago,* 153 F.3d 356, 365 (7th Cir.1998) (quoting *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716–17, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)). *Pullman* abstention is warranted only when (1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling. *Id.*

No state court has had an opportunity to construe the Fair Dealing Act. However, for purposes of the Commerce Clause challenge, there is no uncertainty as to the meaning of the Fair Dealing Act. The Act specifically and repeatedly exempts Illinois wineries from the application of the Act. The defendants do not explain how a state court could clarify the Act so that a ruling on the Commerce Clause challenge would be unnecessary.[6]

With respect to the Contracts Clause challenge, defendants have a stronger argument for *Pullman* abstention. In their attack on Section 35 under the Contracts Clause, plaintiffs argue that Section 35(b) imposes substantial new restrictions on their existing contractual relationships with distributors.[7] Defendants contend that Section 35(b) does not impose new restrictions but instead merely clarifies existing law. According to the Act itself, Section 35 was intended only to clarify obligations under existing Illinois law. Defendants maintain that Section 35(b)'s requirement that suppliers act in good faith was already part of state law.

It is conceivable that a state court could construe the "good faith" provision in Section 35(b) as not imposing any new obligations on parties to existing contracts.[8]

However, defendants do not address the provisions in Section 35(b) requiring a supplier to act without "discrimination or coercion" and prohibiting a supplier from retaliating against a distributor for lobbying on behalf of legislation. Defendants do not contend that these obligations were present under Illinois law before passage of the Fair Dealing Act. Thus, though there is some question as to whether a supplier's obligation under Section 35(b) to act in "good faith" is a new requirement or merely a clarification of existing law, it is unlikely that a state court's clarification of existing law would obviate the need for a decision on the Contracts Clause issue.[9]

Moreover, the potential for delay militates against *Pullman* abstention here. The Supreme Court has indicated that the risk of delay is a consideration in determining if abstention is appropriate. *Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83–84, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). When there is a pending state proceeding that will likely resolve the unsettled state-law questions, there is less risk of delay.[10] *See id.* Here, while there are pending state proceedings, they are before the Illinois Liquor Control Commission and not in the state courts, and it is not clear that the

**6.** It is possible that a state court finding that the Fair Dealing Act violates the Commerce Clause could sever the exception for Illinois wineries. The Act has a severability clause. *See* Section 10(e). The possibility that a state court could sever the offending provisions may weigh in favor of abstention. *See City of Houston v. Hill*, 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). However, for reasons discussed below, the court does not believe that Illinois law permits severance in the circumstances present here. *See* discussion *infra* at 866–69.

**7.** As noted above, Section 35 applies to distributorship agreements whether they were entered into before or after the effective date of the Act.

**8.** However, as is addressed more fully below, it is questionable whether the implied covenant of good faith and fair dealing, which is presumed to be part of every contract, has any application to a party's decision to termi-

nate an at-will contract or renew a contract. *See Jespersen v. Minnesota Mining and Mfg. Co.*, 288 Ill.App.3d 889, 224 Ill.Dec. 85, 681 N.E.2d 67, 71 (1997). Thus, the provisions in Section 35(b) requiring a distributor to act in good faith in terminating or declining to renew a distribution agreement appear to impose new requirements.

**9.** Even if the provisions challenged under the Contracts Clause are ambiguous, the fact that the Commerce Clause challenge does not involve any unsettled areas of state law weighs against *Pullman* abstention. *See Wynn v. Carey*, 582 F.2d 1375, 1381–82 (7th Cir.1978)(declining to abstain from deciding validity of ambiguous judicial consent provision in abortion statute where challenged parental consent provision was clear).

**10.** Unlike *Younger* abstention, there is no requirement that there be a pending state proceeding in order for a federal court to abstain under *Pullman*.

Commission will construe all the challenged portions of Section 35(b) during the proceedings. In their petitions to the Commission, the distributors appear to be claiming that the terminations or decisions not to renew were based on retaliation for the distributors' lobbying for the Fair Dealing Act. The Commission may not have to resolve what "good faith" or "discrimination or coercion" means in order to resolve the present disputes. Of course, the Commission would have to construe these provisions if it were addressing the constitutional challenge to these provisions under the Contracts Clause. However, as noted above, the Commission does not have the authority to decide the constitutionality of a state statute, and it is unclear when the proceedings before the Commission will be completed. Thus, there might be substantial delay before the parties have the opportunity to present their constitutional arguments to the Illinois state courts on administrative review and obtain a construction of the provisions in Section 35(b). In the meantime, plaintiffs remain subject to the preliminary orders by the Commission requiring them to continue doing business with the distributors. Further, because the Act bars any court from overturning preliminary orders of the Commission, the plaintiffs have no opportunity to challenge the preliminary orders. This court concludes that *Pullman* abstention is not required.

### C. *Burford Abstention*

The *Burford* abstention doctrine grew out of the Supreme Court's decision in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Sun Oil Company filed a lawsuit in federal court challenging the validity of an order by the Texas Railroad Commission giving Burford permission to drill four oil wells in an East Texas oil field. Sun Oil claimed the order violated the Due Process Clause and violated state law. In order to manage the oil industry, the Texas legislature had created a complex administrative scheme for addressing issues concerning local oil well drilling. The

Railroad Commission had primary responsibility for administering local drilling. All direct review of the Commission's orders was consolidated in a single state district court. This consolidation was designed to permit the court to develop expertise regarding the regulations and the industry and to ensure uniformity in the administration of the scheme.

The Supreme Court found that the lower federal court should have dismissed the case. The Court noted that Texas had created a complex state administrative scheme and that review of the Commission's decision in the designated state court was "expeditious and adequate." *Id.* at 334, 63 S.Ct. 1098. In contrast, review in the federal courts would lead to "[d]elay, misunderstanding of local law, and needless federal conflict with the state policy." *Id.* at 333–34, 63 S.Ct. 1098.

Later Supreme Court cases have clarified that *Burford* abstention is appropriate (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at the bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. *NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506. The defendants argue that abstention is justified on both of these grounds.

The first type of *Burford* abstention requires that the federal suit raise difficult questions of state law. Plaintiffs are challenging the Fair Dealing Act under the United States Constitution. As noted above in discussing the appropriateness of *Pullman* abstention, the challenge based on the Commerce Clause does not raise difficult questions of state law. The Contracts Clause challenge raises questions about the meaning of Section 35(b) and whether the Act alters state law by limiting the circumstances in which a supplier can terminate or not renew a distribution

agreement. For example, it is not clear precisely what the Act requires in Section 35(b) when it obligates suppliers to act in "good faith," and without "discrimination or coercion." Of course, to evaluate the Contracts Clause challenge, this court would not have to provide a definitive construction of these provisions. Rather, the court would have to determine only if the provisions changed state law and substantially impaired the contractual relationship between the suppliers and distributors.

■ Moreover, these cases are unlike *Burford* in that the plaintiffs here are not merely challenging a single decision by a state administrative body. Instead, the plaintiffs are making a broad constitutional challenge to the Act itself. This court cannot conclude that the arguably "difficult questions of state law bearing on policy problems of substantial public import" transcend the result in the case at bar. *See NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506. Under these circumstances, the first type of *Burford* abstention is not warranted.

The Seventh Circuit has found that two essential elements must be present to justify the second type of *Burford* abstention.

. First, and most obvious, the state must offer some forum in which claims may be litigated.... Second, that forum must be special – it must stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims. The ability to point to a specialized proceeding is a prerequisite of, not a factor in, the second type of Burford abstention.

*ICS*, 153 F.3d at 363–64 (quoting *Property & Casualty Ins. Ltd. v. Central Nat'l Ins. Co. of Omaha*, 936 F.2d 319, 323 (7th Cir.1991)). In *ICS*, the plaintiffs were challenging the denial of a permit by the Chicago Landmarks Commission. The decisions of the Commission were subject to review in the Circuit Court of Cook County pursuant to the Illinois Administrative Review Act. The Seventh Circuit found that the second type of *Burford* abstention did not apply because the Circuit Court of Cook County was not a "special forum"

designated to hear such appeals. The Seventh Circuit noted that the deferential standard of review employed by the Circuit Court further distinguished the scheme from that in *Burford*, where the courts were "working partners." *ICS*, 153 F.3d at 364 (quoting *Burford*, 319 U.S. at 326, 63 S.Ct. 1098).

■ Under *ICS*, it is clear that the second type of *Burford* abstention is not required. As in *ICS*, the Illinois Liquor Control Commission's findings are subject to review under the Illinois Administrative Review Act. There is no special forum.

Moreover, even if there were a special forum, abstention would not be warranted because a decision here would not disrupt any coherent policy and would not lead to additional cases that might threaten the state's ability to develop a coherent policy. The Fair Dealing Act creates substantive law regulating distribution agreements and establishes procedures to resolve disputes. Prior to the Act, the Illinois Liquor Control Commission never had the power to address disputes over the termination or renewal of distributorship agreements, and the Commission and the Illinois courts have not yet construed the Act. At this point, there is no body of law or series of precedents that could be undermined by a decision here. These federal cases present challenges to the constitutionality of the Act and are not likely to produce additional cases that could disrupt the state's efforts to create a coherent policy in the future. "Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state law factors," the constitutional challenges here "would not disrupt the State's attempt to ensure uniformity of an essentially local problem." *NOPSI*, 491 U.S. at 362, 109 S.Ct. 2506 (quotation omitted).

This court concludes that abstention is not appropriate under the *Younger, Pullman*, or *Burford* doctrines. The motions to dismiss are denied.

## II. *Plaintiffs' Motions for a Preliminary Injunction*

The plaintiffs in these related actions have moved for a preliminary injunction enjoining the members of the Commission from applying or enforcing the Fair Dealing Act. To be entitled to a preliminary injunction, a plaintiff must show a likelihood of success on the merits, irreparable harm if the preliminary injunction is denied and the inadequacy of any remedy at law. If plaintiff succeeds in making this preliminary showing, the court must balance the harm to the plaintiffs if the preliminary injunction is wrongfully denied against the harm to the defendants if it is improperly granted. Finally, the court must assess the impact of an injunction on the public interest, meaning, persons not directly concerned in the dispute. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

### A. *Likelihood of Success on the Merits*

### (1) *Constitutionality under the dormant Commerce Clause*

### (a) *The Illinois Winery Exemption Appears to Violate the Dormant Commerce Clause*

Plaintiffs contend that the Fair Dealing Act is unconstitutional under the dormant Commerce Clause of the U.S. Constitution. In particular, they contend that the Illinois winery exemption, which excludes Illinois wineries from most provisions of the Act, renders the Act unconstitutional because it discriminates against out-of-state manufacturers. Plaintiffs argue that the exclusion has no legitimate purpose, but rather is designed to protect and support the local Illinois wine industry.

The Supreme Court has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court has generally struck down the statute without further inquiry. *Brown–Forman Distillers v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). When, however, a statute regulates evenhandedly and has only indirect effects on interstate commerce, the Court examines whether the state's interest is legitimate and whether the burden on interstate commerce exceeds the local benefits. *Id.* There is no clear line separating state regulation that it essentially *per se* invalid from that which calls for a balancing approach. *Id.* Once, however, a state law "is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).

Where state regulation is found to have either a discriminatory purpose or a discriminatory effect, it constitutes "economic protectionism" and is subject to strict judicial scrutiny. *Bacchus Imports Ltd. v. Dias*, 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). The Fair Dealing Act imposes substantial burdens on out-of-state wineries' contractual relationships with distributors, while Illinois wineries are explicitly exempted from such restrictions. Where an exemption applies only to the enacting state's products and where "there is some competition between the locally produced exempt products and non-exempt products from outside the state, there is a discriminatory effect." *Bacchus*, 468 U.S. at 271, 104 S.Ct. 3049. Since the effect is discriminatory, the exemption must be viewed as economic protectionism.[11]

---

11. There is evidence that the winery exemption was discriminatory in purpose. The sponsor of the exemption, Representative Wo-jcik, stated during debates on the Act, "I do have an Amendment ... that is going to protect Illinois wineries." Ex. K to Kendall–

Because the exemption constitutes economic protectionism, the burden shifts to defendants to demonstrate both that the statute serves a legitimate local purpose and that this purpose could not be served as well by available nondiscriminatory means. *Maine,* 477 U.S. at 138, 106 S.Ct. 2440. The defendants argue that there are important differences between out-of-state and Illinois wineries, and that Illinois wineries are subject to a full range of regulatory powers that cannot be enforced against the defendants. The Liquor Commissioners contend that they have the power to inspect Illinois wineries and their manufacturing processes, and that they do not have the power to inspect out-of-state wineries. However, the defendants have suggested no way in which the Act or the Illinois winery exemption addresses the Commissioners' inability to regulate or inspect out-of-state wineries. The Act imposes restrictions on a supplier's ability to terminate or modify its distribution agreements. Since a supplier cannot legally operate in Illinois without an independent distributor, *see* 235 ILCS 5/6–4(a), a supplier's termination of its agreement with a

given distributor cannot have the effect of eliminating a state-regulated distributor or the distributor's regulatory responsibilities under state law, since the supplier will have to enter into another distributorship agreement in order to do business in Illinois.

The defendants also contend that the Fair Dealing Act was enacted to prevent direct sales by manufacturers, stating, "Major distillers, wineries and other manufacturers have declared war on the three-tier system, announcing their intentions to sell direct through the internet, catalogs and other means." Corrected Memorandum of Wirtz Corporation at 4. The defendants claim that direct sales would circumvent the protections provided by the three-tier system in guarding against "under-age drinking, tax avoidance and related evils." However, it is unclear how the Fair Dealing Act prevents direct sales by manufacturers. Manufacturers are prohibited from simultaneously holding manufacturing and retailing licenses,[12] and direct sales are explicitly prohibited by the Illinois Liquor Control Act.[13] Since direct sales are already prohibited, the impact of the Fair

Jackson's Memorandum in Support of Motion for Preliminary Injunction at 5.

12. 235 ILCS 5/6–4.

13. 235 ILCS 5/6–29.1, enacted in 1998, provides as follows:

Sec. 6–29.1 *Direct Shipments of Alcoholic Liquor.* Pursuant to the Twenty-first Amendment of the United States Constitution allowing states to regulate the distribution and sale of alcoholic liquor and pursuant to the federal Webb–Kenyon Act [27 U.S.C. § 122] declaring that alcoholic liquor shipped in interstate commerce must comply with state laws, the General Assembly hereby finds and declares that selling alcoholic liquor from a point outside this State through various direct marketing means, such as catalogs, newspapers, mailers, and the Internet, directly to residents of this State poses a serious threat to the State's efforts to prevent youths from accessing alcoholic liquor; to State revenue collections; and to the economy of this State.

Any person manufacturing, distributing, or selling alcoholic liquor who knowingly ships or transports or causes the shipping or transportation of any alcoholic liquor from a point outside this State to a person in this State who does not hold a manufacturer's, distribu-

tor's, importing distributor's, or non-resident dealer's license issued by the Liquor Control Commission, other than a *shipment of sacramental wine to a bona fide religious organization, a shipment authorized by Section 6–29 [235 ILCS 5/6–29], or any other shipment authorized by this Act,* is in violation of this Act.

The Commission, upon determining, after investigation, that a person has violated this Section, shall give notice to the person by certified mail to cease and desist all shipments of alcoholic liquor into this State and to withdraw from this State within 5 working days after receipt of the notice all shipments of alcoholic liquor then in transit.

Whenever the Commission has reason to believe that a person has failed to comply with the Commission notice under this Section, it shall notify the Department of Revenue and file a complaint with the State's Attorney of the county where the alcoholic liquor was delivered or with appropriate law enforcement officials.

Failure to comply with the notice issued by the Commission under this Section constitutes a business offense for which the person shall be fined not more than $1,000 for a first offense, not more than $5,000 for a second offense, and not more than $10,000 for a

Dealing Act appears to be to restrict an out-of-state manufacturer's freedom to change distributors, rather than to protect against direct sales.

Defendants claim that the Fair Dealing Act was also enacted to counter powerful suppliers who undercut the three-tier system through "onerous contractual provisions with distributors" and through threats of termination. This would appear to be a legitimate purpose behind legislative restrictions on the termination of distributorships, but it is difficult to see how an exemption for Illinois suppliers advances this state interest. While it is probably the case that the Fair Dealing Act would pass constitutional muster if it treated in-state and out-of-state suppliers without discrimination, "It has long been the law that States may not 'build up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States.'" *Bacchus*, *supra* at 272, 104 S.Ct. 3049 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443, 25 L.Ed. 743 (1879)). Defendants have made absolutely no showing that the Act's purpose could not be served equally well by available nondiscriminatory means, such as by imposing its burdens on in-state and out-of-state suppliers equally.[14]

The defendants further argue that even if the Illinois winery exemption would otherwise violate the dormant Commerce Clause, the Twenty-first Amendment limits the effect of the Commerce Clause on a State's regulatory power over the delivery and use of intoxicating beverages within its borders, citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (the Twenty-first Amendment "limits the effect of the dormant Commerce Clause on a State's

regulatory power over the delivery or use of intoxicating beverages within its borders ...."). Section 2 of the Twenty-first Amendment provides, "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The defendants contend that this limitation on the operation of the Commerce Clause provides flexibility for states to address in-state and out-of-state differences by such means as the Fair Dealing Act.

In *44 Liquormart*, the Court cited in *dicta* its prior decision in *Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939), for the proposition that "[t]he States' regulatory power over this segment of commerce is ... largely "unfettered by the Commerce Clause."" *44 Liquormart*, 517 U.S. at 514–15, 116 S.Ct. 1495 (quoting *Ziffrin*, 308 U.S. at 138, 60 S.Ct. 163). However, in a number of decisions following *Ziffrin*, the Court has significantly qualified this language.

The first of these cases was *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). In *Hostetter*, the Court reviewed the series of early Twenty-first Amendment cases ending with *Ziffrin* and stated, "To draw a conclusion from this line of decisions that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would ... be an absurd oversimplification." *Id.* at 331–32, 84 S.Ct. 1293. "Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in light of the

---

third or subsequent offense. Each shipment of alcoholic liquor delivered in violation of the cease and desist notice shall constitute a separate offense.

**14.** Defendants argue that the Act's discrimination in favor of Illinois wineries may be meaningless—and this constitutional issue avoidable—if the evidence shows that all Illi-

nois wineries fall under the Act's exemption for wineries having annual case sales in Illinois less than or equal to 10,000 cases. Kendall–Jackson has, however, provided unrebutted evidence that at least one Illinois winery sold more than 10,000 cases in Illinois in 1998. *See* Ex. 4 to Kendall–Jackson's Reply Memorandum in Support of Motion for Preliminary Injunction.

other, and in the context of the issues and interests at stake in any concrete case." *Id.* at 332, 84 S.Ct. 1293. *See also California Retail Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 109, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (Twenty-first Amendment provides no shelter for violation of the Sherman Act); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 714, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (central question is "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal powers").

The Supreme Court discussed the interplay of the Commerce Clause and the Twenty-first Amendment at length in *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). In *Bacchus,* the state of Hawaii had enacted legislation imposing a sales tax on liquor at wholesale and had exempted from the tax certain locally-produced alcoholic beverages. The Court held that the legislation violated the Commerce Clause, stating, "It is by now clear that the Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." *Id.* at 275, 104 S.Ct. 3049. "Doubts about the scope of the Amendment's authorization notwithstanding, one thing is certain: The central purpose of the provision was not to empower States to favor local liquor industries by erecting barriers to competition. State laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Id.* at 276, 104 S.Ct. 3049. *See also 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 346, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987); *Brown–Forman Distillers v. N.Y. State Liquor Auth.,* 476 U.S. 573, 584, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).

■ In attempting to harmonize state and federal powers where alcoholic beverages are concerned, the court must look to whether the interests implicated by the state regulation in question are so closely related to the powers reserved to the states through the Twenty-first Amendment that the regulation must prevail, despite a conflict with federal policy. *Capital Cities, supra,* 467 U.S. at 714, 104 S.Ct. 2694. The areas primarily reserved for state control by the Amendment are whether to permit importation or sale of liquor and how to structure the liquor distribution system within the state. *Midcal, supra* at 946, 100 S.Ct. 937. A state's interests in promoting temperance and in the reasonable control of traffic in alcoholic beverages are substantial. *44 Liquormart,* 517 U.S. at 490 n. 4, 116 S.Ct. 1495. Under *Bacchus,* state laws enacted to combat the perceived evils of an unrestricted traffic in liquor are entitled to deference under the Twenty-first Amendment. *Bacchus,* 468 U.S. at 276, 104 S.Ct. 3049. However, state laws that constitute mere economic protectionism are not entitled to the same deference. *Id.*

The Fair Dealing Act, by making it more difficult for suppliers to terminate their distributorship agreements, may strengthen the power of distributors relative to suppliers. However, how the Act's explicit discrimination between in-state and out-of-state suppliers advances this objective is not explained. Moreover, assuming that the Fair Dealing Act-putting aside its discrimination between Illinois and out-of-state suppliers-could effectively strengthen distributors relative to suppliers, it is not clear how this would help to prevent direct sales, which are already prohibited by the Liquor Control Act. *See* 235 ILCS 5/6–29.1.[15]

■ The Fair Dealing Act places burdens on out-of-state suppliers from which Illinois suppliers, with whom the out-of-state suppliers are in competition, are exempt. This discrimination has not been shown to advance any legitimate purpose of this legislation. Accordingly, plaintiffs have shown a strong likelihood of succeed-

**15.** This issue is discussed in more detail at pages 874–76, *infra.*

ing on the merits of their claim that the Act, with its Illinois winery exemption, violates the dormant Commerce Clause and is therefore unconstitutional.

### (b) *The Illinois Winery Exemption is Not Severable*

Defendants argue that if the Illinois winery exemption causes the Fair Dealing Act to violate the Commerce Clause, the portion exempting Illinois wineries should be severed. Section 10(e) of the Act provides that "the provisions of this act are severable. If any provision or interpretation of this Act, or the application of such interpretation or provision to any distributorship, is held invalid, the application of the Act to persons or circumstances other than those as to which it is held invalid shall not be affected thereby." The defendants contend that even if the Illinois winery exemption were to be declared unconstitutional, a coherent statute would remain, and this court should give effect to the remaining provisions.

■■■ The settled and governing test of severability is whether the valid and invalid provisions of the Act are so mutually connected with and dependent on each other as conditions, considerations or compensations for each other as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect, the legislature would not pass the residue independently. *People ex rel. Chicago Bar Ass'n v. State Bd. of Elections,* 136 Ill.2d 513, 146 Ill.Dec. 126, 558 N.E.2d 89, 98 (1990), *citing Fiorito v. Jones,* 39 Ill.2d 531, 236 N.E.2d 698, 704 (1968). When it appears, however, that the General Assembly would not have passed the statute with the invalid portion eliminated, severing the unconstitutional portions is inappropriate and the entire act should be declared unconstitutional. *Id., citing Livingston v. Ogilvie,* 43 Ill.2d 9, 250 N.E.2d 138, 146 (1969). Courts, of course, have an obligation to uphold legislative enactments

whenever reasonably possible. *Federation of Advertising Indus. Representatives, Inc. v. City of Chicago,* 189 F.3d 633, 640 (7th Cir.1999), *citing People v. Sanders,* 182 Ill.2d 524, 231 Ill.Dec. 573, 696 N.E.2d 1144, 1149 (1998).

■■■ Determining whether portions of an act are severable is a matter of statutory construction. The existence of a severability clause within the statute is not conclusive. *Best v. Taylor Mach. Works,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1101 (1997). "It is a well-established canon of statutory construction that a statutory severability clause serves only to establish a presumption that the legislature intended for an invalid statutory provision to be severable." *People ex rel. Chicago Bar Ass'n,* 146 Ill.Dec. 126, 558 N.E.2d at 98. Severability clauses do not conclusively establish such intent, and the Illinois Supreme Court has frequently held that unconstitutional provisions of a statute were not severable from the remainder of the statute even though the statute itself contained a severability clause. *Id.* Also, general severability statutes carry less weight in ascertaining legislative intent than specific severability clauses. *Id.*[16]

■■■ The presumption of severability reflected by an express severability clause will be overcome if it appears that the legislature would not have passed the statute without the provision deemed invalid. *Taylor,* 228 Ill.Dec. 636, 689 N.E.2d at 1101. To determine whether the legislature would have passed the statute without the invalid provision, courts consider whether the legislative purpose or object in passing the act is significantly undercut or altered by the elimination of the invalid provisions. *Id.* 689 N.E.2d at 1101–02. Even in cases where the valid sections of an act are complete and capable of being executed, the entire act will be declared void if, after striking the invalid provisions, the act that remains does not reflect the

---

**16.** *Compare Springfield Rare Coin Galleries, Inc. v. Johnson,* 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300, 308 (1986)(invalid exclusion found severable where severability clause and exclusion found invalid added by same amendment).

legislative purpose in enacting the legislation. *Id.* at 1102.

A severability clause must be applied in conformity with the rules of constitutional law. *Commercial Nat'l Bank of Chicago v. City of Chicago,* 89 Ill.2d 45, 59 Ill.Dec. 643, 432 N.E.2d 227, 241 (1982). The general constitutional law rule for provisos that limit the scope of an act was summarized by the Illinois Supreme Court in *Commercial National Bank of Chicago:*

> The general rule has been stated that if a proviso operates to limit the scope of the act in such a manner that by striking out the proviso the remainder of the statute would have broader scope either as to subject or territory, then the whole of the act is invalid because such an extended operation would not be in accordance with the legislative intent as originally expressed in the enactment.

*Id.* at 241, *citing* 16 Am.Jur.2d *Constitutional Law* § 271 (1979). Enforcing an Act without an invalid exemption limiting the scope of its application would, in effect, create a new law. *Id.* at 241. "The new law would be created by [the] court and not by the General Assembly, because it enacted a different one. This would amount to a delegation of legislative powers to the courts, which is contrary to article III of the constitution, as well as numerous decisions of this court." *Ohio Oil Co. v. Wright,* 386 Ill. 206, 53 N.E.2d 966, 974 (1944), *overruled on other grounds by Thorpe v. Mahin,* 43 Ill.2d 36, 250 N.E.2d 633 (1969). *See Taylor,* 228 Ill.Dec. 636, 689 N.E.2d at 1057; *Commercial Nat'l Bank,* 59 Ill.Dec. 643, 432 N.E.2d at 241.

██ In light of these decisions, the Illinois winery exemption cannot be severed from the Fair Dealing Act because deleting the invalid exemption from the Act would impose burdens on Illinois wineries contrary to the legislative intent as originally expressed in the enactment. Severing the invalid winery exemption to impose the Act on Illinois wineries would, in effect, create a new law contrary to the intent of the legislature and contrary to Article III of the Constitution. Since the Fair Dealing Act is not enforceable without the Illinois winery exemption, severance of the exemption is not available to save the Act.

This case is similar to *Heublein, Inc. v. Department of Alcoholic Beverage Control of the Commonwealth of Virginia,* 237 Va. 192, 376 S.E.2d 77 (1989), in which the Supreme Court of Virginia struck down the Virginia Wine Franchise Act because it contained an exemption for certain Virginia wineries in violation of the dormant Commerce Clause.[17] After finding the exemption unconstitutional, the court found that the exemption was not severable from the rest of the Act. "If we [invalidate the entire exemption], we subject Virginia farm wineries to the provisions of the Act in the face of the General Assembly's express contrary intent. This application of the Act will . . . severely alter the Virginia farm wineries' right to contract, thereby imposing substantial and burdensome restrictions upon a group the General Assembly clearly intends to 'promote.'" *Id.* at 81. In the same way, severing the Illinois winery exemption will subject Illinois wineries to similar restrictions and will impose burdensome restrictions upon a group the state legislature explicitly exempted from such burdens and sought actively to promote.[18]

---

**17.** The Virginia Wine Franchise Act forbade any winery from amending a contract with a wholesaler unless the same amendment was made uniformly as to all of the winery's wholesalers in all states where the winery marketed its product. *Heublein,* 376 S.E.2d at 78 n. 4. The Act provided an exemption for Virginia farm wineries that did not sell more than 18,000 liters of wine to any one wholesaler in any one year. *Id.* at 78 n. 3.

**18.** The sponsor of the Illinois winery exemption stated that the purpose of the exemption was to protect Illinois wineries. Ex. K to Kendall–Jackson's Memorandum in Support of Motion for Preliminary Injunction at 5. See also Ex. N.

Accordingly, plaintiffs have shown a likelihood of succeeding on the merits of their claim that the Illinois winery exemption violates the dormant Commerce Clause and cannot be severed from the remainder of the Fair Dealing Act. They have thus established a likelihood of succeeding on the merits of their claim that the Fair Dealing Act is unconstitutional under the Commerce Clause and cannot be enforced against them.

### (2) *Constitutionality of the Fair Dealing Act Under the Contracts Clause*

■ The plaintiffs further contend that the Fair Dealing Act violates the Contracts Clause of the Constitution. A state violates the Contracts Clause if a change in state law operates as a substantial impairment of a contractual relationship.[19] *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992); *Khan v. Gallitano,* 180 F.3d 829, 832 (7th Cir.1999). The relevant inquiry has three components: 1) whether there is a contractual relationship, 2) whether a change in law impairs that contractual relationship, and 3) whether the impairment is substantial. *General Motors Corp.,* 503 U.S. at 186, 112 S.Ct. 1105. The parties dispute number (2). Specificially, plaintiffs claim that the Fair Dealing Act abrogates their contractual right to terminate their distribution agreements at will.

Section 35 of the Act, the portion that applies retroactively and is challenged here, places limitations on suppliers' power to terminate distributorships. While this section does not expressly require that a supplier demonstrate good cause to terminate a distributor, it prohibits a termination or failure to extend or renew, unless it is done "in good faith ... without discrimination or coercion, and not in retaliation or as a result of the distributor's

exercise of its right to petition the General Assembly, the Congress, or any other unit or form of government for any purpose, to any end, or for or against any proposition, provision, amendment, bill resolution, judgment, decision, rule, regulation, or interpretation." The Act establishes a procedure by which "any aggrieved party," namely any distributor, can apply to the Liquor Control Commission for a finding that a supplier has violated Section 35.

As an initial matter, this court must determine whether the agreement between Judge & Dolph and Kendall–Jackson was terminable at-will.[20] Judge & Dolph claims that the agreement was to continue from year-to-year unless good cause for termination existed. However, the contract contains no specific term of duration, a fact that Judge & Dolph does not contest.

■ Contracts of indefinite duration are terminable at the will of either party. *Jespersen v. Minnesota Mining and Manufacturing Co.,* 183 Ill.2d 290, 233 Ill.Dec. 306, 700 N.E.2d 1014, 1016 (1998). *See also Industrial Representatives, Inc. v. CP Clare Corp.,* 74 F.3d 128, 129 (7th Cir. 1996) ("in Illinois a contract without a fixed term may be ended for any or no reason"); *Hirschauer v. Chicago Sun–Times,* 192 Ill. App.3d 193, 139 Ill.Dec. 245, 548 N.E.2d 630, 636 (1989)("a contract for an indefinite term is terminable at will for any reason, good cause or not, or no cause at all"). However, "[a]n agreement without a fixed duration but which provides that it is terminable only for cause or upon the occurrence of a specific event is in one sense of indefinite duration, but is nonetheless terminable only upon the occurrence of the specified event and not at-will." *Jespersen,* 233 Ill.Dec. 306, 700 N.E.2d at 1016.

A termination provision is not sufficient to take an agreement of indefinite duration

19. "No state shall ... pass any ... Law impairing the Obligation of Contracts ..." U.S. Const., Art. I, § 10, cl. 1.

20. Pacific Wine Co. does not dispute that its contract with Jim Beam was at-will. Sutter

Home states in its brief that it had a written agreement with RJ that expressly permitted Sutter Home to terminate the contract for certain acts constituting RJ's breach, and expressly provided for the agreement's expiration on June 30, 1999.

out of the general rule of at-will termination if the language is "permissive and equivocal." *Jespersen*, 233 Ill.Dec. 306, 700 N.E.2d at 1016. Such language "is in stark contrast to a case in which the parties included an exclusive and specific right to terminate for cause in a contract otherwise of indefinite duration." *Id.* Also, "Illinois courts have consistently held that '[s]atisfactory or acceptable performance language does not transform a contract with no definite time period-one at-will-into a contract which cannot be terminated by either party at any time for any reason.'" *Hammond Group, Ltd. v. Spalding & Evenflo*, 69 F.3d 845, 848 (7th Cir. 1995) (quoting *Gordon v. Matthew Bender & Co., Inc.*, 562 F.Supp. 1286, 1291 (N.D.Ill.1983)).

▮▮▮ Judge & Dolph contends that statements by Jess Jackson, owner of Kendall–Jackson, demonstrate that Kendall–Jackson's agreement was intended to be terminable only for good cause based upon non-performance. Judge & Dolph points to two statements in the transcript of Jackson's deposition. Jackson testified that he told Judge & Dolph that "if they didn't do the job, we'd terminate them." He further testified that Rocky Wirtz of Judge & Dolph said to him in essence, "[I]f we don't [improve distribution], you can have the brand back." However, the statements cited by Judge & Dolph do not show that the contract is not an at-will agreement. Rather, they merely make a general reference to satisfactory performance. Such language is not sufficient to transform an at-will contract into a contract which cannot be terminated by either party at any time for any reason. The statements are not of a specific nature as required under *Jespersen*. It thus appears from the record that the agreement is at-will under Illinois law.

The next issue is whether the good-faith requirement imposed by the Fair Dealing Act impairs the agreement. Under Section 35(b), suppliers may not fail to renew or extend an agreement with a distributor "except by acting in good faith in all aspects of the relationship, without discrimination or coercion, and not in retaliation or as a result of the distributor's exercise of its right to petition the General Assembly, the Congress, or any other unit or form of government." Section 35 applies retroactively to pre-existing business relationships. *See* Section 10(d).[21] A distributor which believes it is being terminated in violation of the good faith requirement of the Act can petition the Liquor Control Commission for an order requiring the continuation of the distribution arrangement until a final order of the Commission, for which there is no statutory time limit. The plaintiffs contend that Section 35 of the Fair Dealing Act violates the Contracts Clause because the good faith obligations of the Section substantially impair their right to terminate their at-will distributorship agreements with the defendants. The defendants contend that the Section merely codifies existing law and does not impair the existing agreements.

▮▮▮ Under Illinois law, a covenant of good faith and fair dealing is implied in every contract. *Capital Options Investments, Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir.1992). However, this covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract, and by itself does not create a cause of action. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1444 (7th Cir.1992). Litigants may not seek to litigate issues of "good faith" in lieu of abiding by explicit provisions of contracts. *L.A.P.D. Inc. v. General Electric Corp.*, 132 F.3d 402, 404 (7th Cir.1997). "More often than we care to recall, we have reminded litigants that 'good faith' in contract law is a gap-filling

21. "... Section 35, which clarifies existing rights and obligations and establishes remedial provisions, applies to all agreements between a distributor and a supplier ... whether those agreements were entered into before or after the effective date of this Act." Illinois Wine and Spirits Industry Fair Dealing Act of 1999, § 10(d).

approach designed for an issue 'that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" *Id.* (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990)). In *L.A.P.D.,* the Seventh Circuit held that where the contract is at-will in nature, termination without cause does not give rise to a violation of good faith rights because the terminating party was acting within its rights under the contract. "One party need not reveal to the other the criteria that will lead it to terminate the relation, when the contract allows any reason (or none) to suffice." *Id.*

"[T]he duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will." *Jespersen v. Minnesota Mining and Manufacturing Co.,* 288 Ill.App.3d 889, 224 Ill.Dec. 85, 681 N.E.2d 67, 71 (1997), *aff'd,* 183 Ill.2d 290, 233 Ill.Dec. 306, 700 N.E.2d 1014 (1998). The Fair Dealing Act imposes a duty of good faith and fair dealing on all refusals to renew or extend distribution contracts, including at-will agreements, and prevents termination while the issue of good faith is being litigated. Because the duty of good faith and fair dealing implied in all contracts does not override the right to terminate at will, the Act imposes a new condition on the agreement. It is therefore destructive of the right to terminate at will.

The defendants argue that termination of at-will contracts is always restricted by good faith, preventing contracting parties "from terminating agreements in bad faith in retaliation for exercising the right to petition for redress of grievances." In support of this proposition, Judge & Dolph cites *Dayan v. McDonald's Corp.,* 125 Ill. App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958 (1984), which states that "the doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract." *Id.* at 972. Defendants contend that this limitation on discretion extends to the discretion to terminate an at-will agreement.

The Seventh Circuit addressed the holding in *Dayan* in the context of an at-will employment agreement in *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436 (7th Cir.1992). In *Beraha,* the court held that "the covenant of good faith, which is a principle of construction, gives way to the rule that an employment at-will contract is terminable for any reason. Otherwise, the employment at-will principle would be meaningless." *Id.* at 1444. The court noted that its holding "comports with the principle articulated in *Dayan:* the implied covenant of good faith and fair dealing requires a party vested with discretion to exercise that discretion reasonably, with the proper motive and in a manner consistent with the reasonable expectations of the parties." *Id.* Because Illinois law has consistently held that an employee at-will may be terminated for any reason, an employee at-will has no reasonable expectation that he will be terminated only for cause, and the implied covenant of good faith and fair dealing cannot require the parties to exceed that reasonable expectation. *Id.* at 1444–45. In the same way, since the agreements between the suppliers and the distributors in this case are at-will in nature, the distributors had no reasonable expectation that their distributorship agreements would not be terminated for the statutorily-prohibited reasons.

Defendants claim that their good faith argument is supported by Illinois law as illustrated by *Hentze v. Unverfehrt,* 237 Ill.App.3d 606, 178 Ill.Dec. 280, 604 N.E.2d 536 (1992). In particular, Judge & Dolph points to the court's statement in that case that "we do not equate an at-will termination clause with an express disavowal of good faith." *Hentze,* 178 Ill.Dec. 280, 604 N.E.2d at 539. However, Judge & Dolph mischaracterizes the holding in *Hentze. Hentze* involved termination of a dealership in circumstances where the defen-

dants had engaged in deliberate acts against Hentze in an attempt to run him out of business. By engaging in such acts, defendants "went far beyond the intendments of any at-will clause. By doing so, they breached the contract and violated the implied obligation of good faith present in every contract." *Id.* at 540. The court stated that had the manufacturer merely "sent Hentze a termination letter immediately, we would be hard-pressed to find any absence of good faith. [The manufacturer] had the right to terminate the contract for no reason at all." *Id.*

The Seventh Circuit has rejected the contention that the holding in *Hentze* supports a claim that termination of an at-will contract is restricted by good faith. *See L.A.P.D., Inc. v. General Elec. Corp.*, 132 F.3d 402, 404 (7th Cir.1997). *See also Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1106 (7th Cir.1997)("*Hentze* ... involved an unambiguous breach of contract claim, not an independent claim based on the implied covenant of good faith and fair dealing"); *Industrial Representatives, Inc. v. CP Clare Corp.*, 74 F.3d 128, 131 (7th Cir.1996) ("*Hentze* held that the terms of a sales agency contract control even in the face of opportunism, and we are confident that *Hentze* represents the position the Supreme Court of Illinois would take on that question.").

As the Seventh Circuit has made clear, when a contract permits termination without cause, "use of that power is not contingent on satisfying a court [or presumably an administrative agency] that the decision was an exercise of 'good faith and fair dealing.'" *L.A.P.D.*, 132 F.3d at 404. "One party need not reveal to the other the criteria that will lead it to terminate the relation, when the contract allows any reason (or none) to suffice." *Id.* By permitting a distributor to prevent termination while the parties litigate whether or not the reasons for the termination complied with the statutory criteria of the Fair Dealing Act, the Act eviscerates the value to the supplier of the contractual right to terminate at will.

Section 35 of the Act states explicitly that it "clarifies existing rights and obligations ..." Section 35(a). It states that its enforcement mechanism exists "to enforce the existing obligation of good faith ..." Section 35(c). But the section does something quite revolutionary in the context of an at-will agreement: it authorizes a distributor to bring a supplier before an administrative agency to explore the reasons for which the supplier wishes to terminate the relationship and to prevent the termination if it is done other than "in good faith in all aspects of the relationship, without discrimination or coercion, and not in retaliation or as a result of the distributor's exercise of its right to petition the General Assembly, the Congress, or any other unit or form of government for any purpose, to any end, or for or against any proposition, provision, amendment, bill, resolution, judgment, decision, rule, regulation, or interpretation." Section 35(b). However an Illinois court might construe Section 35's requirement of good faith, by allowing a distributor to compel a supplier to justify its termination decision as a condition to termination and to prohibit terminations for the reasons the Act specifies, the Act has destroyed the supplier's contractual right to terminate at will. For this reason, plaintiffs have shown a likelihood of succeeding on the merits of their claim that Section 35 impairs the parties' contractual relationships.

The next inquiry is whether the impairment to the contractual relationship created by the Act is substantial. In determining whether an impairment is substantial, the level of scrutiny to which the legislation is subjected increases in proportion to the severity of the impairment. *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *Id.* "An impairment rises to the level of substantial when it abridges a right which fundamentally induced the parties to contract initially or when it

abridges legitimate expectations which the parties reasonably and heavily relied upon in contracting." *Bricklayers Union Local 21 v. Edgar*, 922 F.Supp. 100, 106–07 (N.D.Ill.1996). *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 246, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

In determining the extent of the impairment, the court must consider whether the industry in which the complaining party is engaged has been regulated in the past, because a history of regulation bears on the parties' expectations at the time of contracting. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. 697; *Veix v. Sixth Ward Bldg. & Loan Assn.*, 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). However, the fact that an industry is highly regulated is not itself controlling on the issue of the extent of impairment, since the degree of past regulation is pertinent only to the extent that it bears on the impairment's foreseeability. As the Seventh Circuit has stated, "[A] history of regulation is never a sufficient condition for rejecting a challenge based on the contracts clause." *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 895 (7th Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999). Rather, "[o]f great, and we are inclined to say controlling, importance in the determination of whether a law violates the contracts clause is the foreseeability of the law when the original contract was made; for what was foreseeable then will have been taken into account in the negotiations over the terms of the contract." *Id.* at 894–95. *See also Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383, 384 (8th Cir.)("in determining whether an impairment is substantial, and thus unconstitutional, a court should take into account whether the kind of contract or relationship that furnishes the subject matter of the dispute had previously been the subject of regulation."), *cert. denied*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994). "[A] contractual obligation is not impaired within the meaning that the modern cases impress upon the Constitution if at the time the contract was made the parties should have foreseen the new regulation challenged under the clause." *Chrysler Corp.*, 148 F.3d at 897. "The idea, evidently, is that if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed. To put it in economic terms, a party's evaluation of the possibility of interference is reflected in the negotiated price, and thus the value of performance to it is not reduced, if it can more or less accurately value the risk of that interference." *Holiday Inns Franchising, Inc.*, 29 F.3d at 385.

The Act's restriction on the plaintiffs' rights to terminate their distribution agreements at-will will likely be found to constitute a substantial impairment. A manufacturer's lifeline to the consuming public is its distributor, and a distributor can, to a significant extent, make or break a manufacturer's success in the marketplace. Predictably, where termination of a distribution contract is not within the manufacturer's sole discretion but instead must be justified to a court or administrative agency, the parties at the time of contracting would be far more inclined to articulate rights, duties and expectations, than where termination is entirely discretionary and need not be justified. For this reason, a limitation on the manufacturer's right to terminate its distributor at will can be presumed to constitute a significant abridgment of the parties' legitimate expectations at the time of contracting.

Further, plaintiffs will likely be able to establish that retroactive implementation was not foreseeable. Although the wine and spirits industry is highly regulated, the Illinois Liquor Control Act of 1934 says nothing about the termination of at-will distribution agreements. Moreover, in a related industry, when Illinois enacted legislation regulating distributor termination rights, such regulations were not retroactive. *See* Beer Industry Fair Dealing Act, 815 ILCS 720/1 *et seq.*

Moreover, the court rejects the argument that the Twenty-first Amendment

874

puts this retroactive impairment beyond judicial scrutiny. In *California Retail Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court stated that "[t]he Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor an how to structure the liquor distribution system." *Midcal,* 445 U.S. at 110, 100 S.Ct. 937; *see also North Dakota v. United States,* 495 U.S. 423, 431, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990). However, in *Midcal* itself, as well as in a number of other cases, the Supreme Court made clear that the states' authority in the matter of liquor-related regulation is not absolute.

In *Midcal,* the Supreme Court held that California's resale price maintenance system, by which wine suppliers were required to establish resale prices below which merchants were not permitted to sell, violated the Sherman Act and could not be enforced. The Court found that the asserted state interest in promoting temperance and protecting the economic survival of small retailers was less substantial (at least in part because not supported by evidence that resale price maintenance schemes effectively promote such interests) than the national policy in favor of competition. *Midcal* makes clear that even with respect to state regulation intended to strengthen state liquor distribution systems, the Twenty-first Amendment does not entirely displace federal commerce power.

The conflict between state and federal authority at issue in *Midcal* involved the Sherman Act, and the Sherman Act is an exercise of Congress' power under the Commerce Clause, the source of federal power which the Twenty-first Amendment most significantly displaces. In dealing with sources of federal power other than the Commerce Clause, the reach of the Twenty-first Amendment is far more limited. In *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), for instance, the Court found that Oklahoma's attempt to regulate liquor advertising appearing on cable television broadcasts originating out-of-state was preempted by FCC regulations and violated the Supremacy Clause. The Court held that when "a state regulation squarely conflicts with the accomplishment and execution of the full purposes of federal law, and the State's central power under the Twenty-first Amendment of regulating the times, places, and manner under which liquor may be imported and sold is not directly implicated, the balance between state and federal power tips decisively in favor of the federal law." *Id.* at 716, 104 S.Ct. 2694. *See also Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding unconstitutional under the Equal Protection Clause a gender-based differential in the drinking age).

Similarly, in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the Court held that Rhode Island's liquor price advertising ban, justified by the state as a means of promoting temperance, violated the First Amendment. The Court stated, "[A]lthough the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, 'the Amendment does not license the States to ignore their obligations under other provisions of the Constitution.'" *Id.* at 516, 116 S.Ct. 1495 (quoting *Capital Cities Cable,* 467 U.S. at 712, 104 S.Ct. 2694). In conformity with *44 Liquormart* and the cases on which it relies, this court concludes that the Twenty-first Amendment does not empower the state of Illinois to abrogate rights under the Contracts Clause.

Whether analyzed under the Twenty-first Amendment or under Illinois' inherent police power, the Fair Dealing Act may still be found to be constitutional if there is a significant and legitimate public purpose which the Act serves. The sovereign right of states "to protect the lives, health, morals, comfort and general welfare of the people . . . is paramount to any

rights under contracts between individuals." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests. *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. 697. Once a legitimate public purpose has been identified, the court must assess whether the Act's adjustment of the rights and responsibilities of the parties is reasonable and is of a character appropriate to the public purpose justifying the legislation's adoption. *Id.* Courts defer to legislative judgment as to the necessity and reasonableness of a particular measure. *Id.* at 413, 103 S.Ct. 697. The Fair Dealing Act states that its purpose is "to promote the public's interest in fair, efficient, and competitive distribution of wine and liquor products." Section 10(a)(ii). Defendants contend that the Act is necessary to protect the three-tier system of distribution by which Illinois controls and regulates the importation and sale of liquor. The defendants claim that consolidation in the supplier ranks has led to large multinational concerns with much greater economic power than the distributors have, and that this power can be used to impose onerous conditions on the distributors. Further, defendants contend that the Fair Dealing Act is needed to counter the threat of direct sales by manufacturers. A strong network of local distributors, the defendants argue, serves many important state interests:

> This middle tier [of distributors] deals directly with retailers who sell alcoholic beverages to the public, guards against sales to unlicensed providers and serves to prevent direct unauthorized sales by manufacturers to minors and sales which evade state taxes. Distributors must store alcoholic liquor at licensed premises "before sale and delivery to licensees" in the State and must keep accurate records of all liquor sold and delivered. 235 ILCS 5/6–8. Local storage and local record keeping enable state authorities to perform inspections and other regulatory and tax functions that would not otherwise be possible. Distributors are responsible for payment of substantial taxes imposed on the privilege of engaging in the liquor business. 235 ILCS 5/8–1 et seq. These and other functions performed by distributors play a key role in the alcoholic beverage regulatory system established by Illinois in the exercise of its broad powers under the Twenty-first Amendment.

Corrected Memorandum of Wirtz Corp. in Opposition to Kendall–Jackson's Motion for a Preliminary Injunction at 3–4. Defendants contend that the Act will remedy unequal bargaining power and avoid unfair practices. The plaintiffs counter that the Act has no broad public purpose, and that it is merely intended to protect local industries.

Unquestionably, the state interests served by a strong local distributorship network are substantial, and a judgment by the Illinois legislature that that interest is best-served by prohibiting termination of distributorships except for good cause is beyond challenge. What is not adequately addressed in defendants' briefs, however, is how such an interest is served by Section 35's *retroactive* imposition of a limitation on termination rights. The court has strained to find some way in which the retroactive portion of this legislation advances the legislation's broader purposes. Except insofar as the legislation aids specific distributors which specific suppliers currently wish to terminate, the court is able to discern no reasonable justification for Section 35's retroactive reach.

Under Illinois law, manufacturers are prohibited from simultaneously holding manufacturing and retailing licenses, and direct sales are explicitly prohibited by the Illinois Liquor Control Act. *See* 235 ILCS 5/6–4, 5/6–29.1. Hence, a manufacturer who terminates a distribution agreement must contract with another Illinois distributor if it wishes to continue doing business in Illinois. For this reason, insofar as it op-

erates retroactively, the challenged provisions of the Fair Dealing Act appear primarily to protect distributors from loss of their current contractual agreements, rather than protecting distributors generally. Any supplier who terminates a current distribution contract is required, in order to comply with Illinois law, to find another distributor.

While the parties do not make this argument, it has occurred to the court that a prohibition on the termination of existing distributorships could conceivably serve to prevent the direct sales to consumers with which the legislature was concerned in the following way. A manufacturer is currently prevented from making direct sales not only by the fact that such direct sales are illegal, but also by the fact that some of the distributorship agreements in question are exclusive. If a supplier with an exclusive distribution agreement were to make direct sales through such means as the Internet, the distributor would have a cause of action against the supplier for breach of their exclusive contract. If such suppliers were allowed to terminate their existing distributorship agreements, they would be free to engage in direct sales, limited only by their fear of legal action by the state, perhaps a less effective method of policing their conduct than a private action by a distributor.

While this is a conceivable state purpose served by the retroactive nature of this legislation, it seems a hopelessly ineffective and blunt instrument to accomplish such a purpose. Any manufacturer not currently in a distributorship agreement with an Illinois distributor would remain free to engage in illegal direct selling. Any supplier which could demonstrate a legislatively-permissible reason to terminate would also have a means of extracting itself from its current distribution arrangement and to engage in direct selling, assuming that only fear of a breach of contract suit by a distributor inhibited it from direct selling in violation of Illinois law. And even in the case of plaintiffs here, only two of the three have exclusive distributorship agreements; Sutter Home does not. In any event, it is unlikely that major suppliers, such as plaintiffs in these cases, would choose to become outlaws, trying to serve the Illinois marketplace only by illegal direct sales and risking prosecution by the state, and would entirely forego lawful distribution channels. As long as suppliers who terminate their distribution agreements are required to have an Illinois distributor to continue operating lawfully in Illinois, those suppliers could be made subject to whatever contractual requirements the legislature chose to impose non-retroactively to serve the state's goal of strengthening the bargaining position of distributors.

"A law imposing 'a generally applicable rule of conduct designed to advance "a broad societal interest"' will typically fare better in scrutiny under the Contracts Clause than a law that strictly addresses contractual obligations and remedies." *Wisconsin Cent. Ltd. v. Public Serv. Com'n of Wis.*, 95 F.3d 1359, 1371 (7th Cir.1996) (quoting *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983)). While maintenance of a strong three-tier distribution system can be seen to advance broad societal interests, it is difficult to see how the retroactive imposition of a limitation on termination of existing distributorships does anything other than adjust the contractual obligations and remedies of the parties currently in such distributorship arrangements. Indeed, defendants argue explicitly that the Act prevents unfairness resulting from uneven bargaining power between Illinois distributors and large out-of-state suppliers; to the extent that the retroactive imposition of the good-faith requirement was intended to adjust contractual obligations retroactively to give one party what it was unable to obtain through negotiations at the time of contracting, the Act would seem not only unconstitutionally to impair the parties' contractual relationships but to have done so intentionally.

In support of its argument that the Act is constitutional, Judge & Dolph points to *Empire Distributors of the Carolinas, Inc. v. Heublein Wines*, 1985 WL 17505 (E.D.N.C.1985), which upheld the constitutionality of a North Carolina statute imposing a retroactive good-cause-for-termination requirement and providing for administrative proceedings to decide if good cause existed, and *Schieffelin & Co. v. Department of Liquor Control*, 194 Conn. 165, 479 A.2d 1191 (1984), holding that the retroactive diminution of the time period during which a dealership had to have been in existence from twenty-four months to six months before it could be terminated without a showing of good cause did not violate the Contracts Clause. These decisions dealt with different state regulatory schemes, and rested largely on the courts' conclusions as to the regulations' foreseeability in the context of a heavily regulated liquor industry. Because the regulatory schemes at issue were different from that involved here, and because of the Seventh Circuit's insistence that the foreseeability of the particular measure at issue be the focus of the court's Contracts Clause analysis, rather than simply the degree of regulation of the industry as a whole, *see Chrysler Corp. v. Kolosso Auto Sales, Inc., supra*, 148 F.3d at 895, the court finds these decisions unpersuasive in the context of the case at bar.

At least three state courts have found that retroactive limitations on alcohol dis- tribution contracts unconstitutionally impair contractual rights. In *Birkenwald Distributing Co. v. Heublein, Inc.*, 55 Wash.App. 1, 776 P.2d 721 (1989), the court of appeals of Washington found that the retroactive imposition of a termination-only-for-cause requirement was an unconstitutional impairment of contract rights.[22] A similar result was reached in *Jacobsen v. Anheuser–Busch, Inc.*, 392 N.W.2d 868 (Minn.1986), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 941, 93 L.Ed.2d 991 (1987), dealing with the Minnesota Beer Brewers and Wholesalers Act, which applied retroactively to prohibit brewers from unreasonably withholding consent to the assignment, transfer or sale of the wholesaler's business. Finally, in *Heublein, Inc. v. Department of Alcoholic Beverage Control of the Commonwealth of Va.*, 237 Va. 192, 376 S.E.2d 77, 79 (1989), the Virginia Supreme Court found that the Virginia Wine Franchise Act, which contained a retroactive provision restricting a supplier's right to terminate an at-will contract, violated the contracts clause of the Virginia constitution.[23] The provision also affected prestatutory performance or termination of such contracts, forbidding suppliers to exercise their at-will rights in the six-month period before the Act became effective.[24] The defendants argued that without the retroactive provisions of the Act, suppliers could upset the system by retaliatory terminations of existing contracts with those wholesalers who advocated adoption of the Act. The court rejected this argument,

**22.** The court found that the legislation before it violated the state constitution's contracts clause, but found that the state provision "is substantially similar to its federal counterpart" and the "two clauses are given the same effect." *Birkenwald*, 776 P.2d at 723.

**23.** Article 1, § 11 of the Virginia Constitution provides that "the General Assembly shall not pass any law impairing the obligation of contracts."

**24.** The court compared the nature of the impairment to the contractual impairments in the *Empire Distributors* and *Schieffelin* decisions, finding them inapplicable. "Our reading of those cases ... indicates that they deal only with the validity of legislation affecting the future performance and termination of contracts in existence when a legislative act becomes effective. They do not discuss a legislative effort to make statutes retroactive so as to affect pre-statutory performance or termination of such contracts." *Heublein*, 376 S.E.2d at 79. It is unclear from the opinion whether the *Heublein* court would have found the Act to be a "severe alteration of contractual obligations" if it had not contained the provision preventing suppliers from exercising at-will rights prior to the effective date. It should be noted that plaintiffs here have been enjoined from carrying out terminations announced before the effective date of the Fair Dealing Act.

stating, "The difficulty with the argument is that if any such contract is terminated, the supplier who desires to continue to do business in Virginia must execute another contract with some other Virginia wholesaler." *Heublein,* 376 S.E.2d at 78.

The court concludes that plaintiffs have shown a likelihood that they will be able to establish that the retroactive imposition of a good faith requirement and the prohibition of terminations based on the causes enumerated in Section 35 impairs their contractual rights and is not justified by a significant and legitimate public purpose, in violation of the Contracts Clause of the Constitution.

### B. *Irreparable Injury and the Balance of Harms*

██ Plaintiff have adequately shown a likelihood that they will succeed in demonstrating a substantial impairment of their constitutional rights under both the dormant Commerce Clause and the Contracts Clause. A violation of these constitutional rights constitutes irreparable injury. *American Library Ass'n v. Pataki,* 969 F.Supp. 160, 168 (S.D.N.Y.1997) (Commerce Clause); *Government Suppliers Consolidating Serv. v. Bayh,* 734 F.Supp. 853, 864 (S.D.Ind.1990) (same); *Citicorp Services, Inc. v. Gillespie,* 712 F.Supp. 749, 753 (same). *See also Allen v. State of Minn.,* 867 F.Supp. 853, 859 (D.Minn.1994) (impairment of constitutional rights under Commerce and Contracts Clauses constitutes irreparable injury in context of request for permanent injunction). There is no adequate remedy at law for such a violation. Moreover, plaintiffs are being compelled to do business with distributors whom they wish to terminate and, because of provisions of the Act barring any state judicial interference with the proceedings before the Liquor Control Commission, cannot, in the foreseeable future, seek a remedy from the Illinois courts.

While the court must act with great caution when asked to invalidate a state statute embodying the public policy of the state, the balance of harms decidedly favors the plaintiffs in these cases. Defen-

dant members of the Liquor Control Commission will not be harmed by advancing the consideration of the constitutional questions this statute presents from the time of administrative review to the present. Indeed, the court's consideration of the constitutional limitations of this legislation may assist the Commission in its scrutiny of the parties' positions. Defendant distributors will, of course, stand to suffer economic injury if plaintiffs are permitted to terminate their distribution contracts pending a final decision on the merits of this case. However, this injury, if the terminations are found to have been improper, is readily compensable in damages. The improper termination of a contract is an injury which can easily be addressed by means of money damages, and in no way can be viewed as irreparable.

Finally, while there is a substantial public interest in the ability of the state of Illinois to regulate the distribution of wine and spirits within its borders and the court accepts the judgment of the Illinois legislature that the public interest is best served by strengthening the network of local distributors and preventing direct sales of alcoholic beverages by suppliers, the public has at least an equal interest in the maintenance of the constitutional system of government embodied in the Commerce Clause and the Contracts Clause. In the court's view, in view of the strong likelihood of success on the merits which the plaintiffs have demonstrated, the public interest is best served by delaying implementation of the provisions of the Fair Dealing Act until the court has been able to pass upon the constitutional issues the plaintiffs have raised.

### CONCLUSION

Abstention is not required under *Younger, Pullman,* or *Burford.* The motions to dismiss in No. 99 C 3813 by the Illinois Liquor Control Commission [19] and Judge & Dolph [21] are denied. The motions to dismiss in No. 99 C 4312 by Pacific Wine Company [10] and the Illinois Liquor Control Commission [12] are denied. The

motions to dismiss in No. 99 C 4998 by the Illinois Liquor Control Commission [2] and RJ Distributing Company [11] are denied. The motions of Kendall–Jackson [12], Jim Beam [16] and Sutter Home [2] for a preliminary injunction are granted.

The parties will appear before the court on Friday, January 7, 2000, at 9:30 a.m., at which time plaintiffs should be prepared to present a draft preliminary injunction order, preferably agreed as to form, and the parties should be prepared to discuss an injunction bond.